**CAJUN ELECTRIC POWER COOPERATIVE, INC.,** Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION,** Respondent.

**Louisiana Public Service Commission, et al.,** Intervenors.

No. 94–1556.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1995.

Decided Oct. 6, 1995.

---

Bernhardt K. Wruble, Washington, DC, argued the cause for petitioner, with whom J. Cathy Fogel was on the brief.

Edward S. Geldermann, Bethesda, MD, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent, with whom Jerome M. Feit, Solicitor, and Joseph S. Davies, Jr., Deputy Solicitor, Federal Energy Regulatory Commission, were on the brief.

Barry S. Spector, Washington, DC, argued the cause and filed the brief for intervenor Gulf States Utilities Company.

Noel J. Darce, New Orleans, LA, entered an appearance for intervenor Louisiana Public Service Commission.

Before WALD, SILBERMAN, and ROGERS, Circuit Judges.

SILBERMAN, Circuit Judge:

This case returns after remand. Cajun Electric Power Cooperative, Inc., a cooperative composed of electric utilities, again petitions challenging the Federal Energy Regulatory Commission's interpretation of a contract between Cajun and a competing utility which was filed as a rate schedule with the FERC. This time we deny the petition.

## I.

The background of this dispute is described in our prior opinion. *Cajun Elec. Power Coop., Inc. v. FERC,* 924 F.2d 1132 (D.C.Cir.1991). Cajun and Gulf States Utilities Company disagree as to the meaning of a 1980 amendment to a power integration agreement (PIA). Cajun argues that this clause obliges Gulf States to deliver electricity to Cajun's members at any point reached by Gulf States' transmission system whether or not it is off a Cajun member's integrated system (traditional area of service).[1] One of Cajun's members sought to provide electricity to customers (presumably at a lower price) who are located off that member's integrated system. Gulf States, owning the transmis-

---

On Petition for Review of an Order of the Federal Energy Regulatory Commission.

---

1. As before, the disposition of this case does not require us to determine the geographical scope of a Cajun member's integrated system.

sion system and objecting to what it perceived as an attempted sortie into its service area, refused.

Before the amendment, Gulf States' obligation to provide transmission services to Cajun was limited by the following provision:

> To assure the applicability of all the standards and conditions for transmission hereunder, ... it is agreed that for purposes of this Service Schedule, all delivery points initially included in Exhibit "A" of Rate Schedule CSTS and *added by mutual agreement of the parties* shall be limited to delivery points on an integrated part of the system of a rural electric cooperative ... which is an active member of [Cajun].

Section 5.1 (emphasis added). The amendment, which was added to the PIA without any change in Section 5.1, provides that:

> If the parties fail to reach mutual agreement for [Gulf States] to furnish additional points of delivery or increases in capacity for whatever reasons, then [Cajun] shall have the option of providing the necessary distribution and transmission facilities to interconnect with [Gulf States'] existing transmission system *at mutually agreeable points,* subject to appropriate approvals and certifications by any regulatory authorities having jurisdiction. [Gulf States] shall have the right to contest such interconnection in any regulatory proceeding and otherwise.

Section 3.3(d) (emphasis added).

FERC originally concluded that these clauses unambiguously supported Gulf States' interpretation. We easily rejected that conclusion as unsupportable; whatever one's view of this agreement, unambiguous it is not. The confusion is, of course, created by the second reference to mutual agreement in Section 3.3(d) ("mutually agreeable points"). Cajun claims that this phrase enables Gulf States to refuse to provide delivery points off a member's integrated system *only* based on engineering considerations. Gulf States contends, on the other hand, that Section 3.3(d) does not compel it to provide service off a Cajun member's integrated system. That can occur only if Gulf States subsequently agrees. In that respect, Section 5.1 still governs. Section 3.3(d) did ex-

pand Gulf States' obligation to provide a delivery point to Cajun members by requiring Gulf States to provide, or allowing Cajun to construct, new delivery points to accommodate *more* than a normal load increase *on* a member's integrated system.

Neither interpretation flows naturally out of the language of the agreement. Cajun's limitation on the phrase "mutually agreeable points" in Section 3.3(d) is not apparent, and Gulf States' limitation on the phrase "for whatever reasons" to exclude a Cajun member's desire to force Gulf States to deliver electricity beyond the member's integrated system is, similarly, not apparent.

## II.

■ We previously rejected FERC's rather incredible determination that the contract was unambiguous and therefore remanded so that Cajun could show the parties' intent through evidence of the bargaining history. We stated that "[i]f after these proceedings it still can be said that the parties never meant squarely to address the issue raised by this dispute, then the Commission is entitled to place its own construction on the resultant ambiguity—so long as it is reasonable." 924 F.2d at 1137; *see also National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1568–70 (D.C.Cir.), *cert. denied,* 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987) (holding that FERC's interpretation of a settlement agreement between the Commission's staff and a private party was entitled to *Chevron* deference). Although petitioner now claims that the Commission's interpretation should not be afforded deference because the language clearly supports its interpretation, we do not take that argument any more seriously than we did the original FERC position. Nor do we think much of petitioner's claim that FERC must assert a specific public policy supporting its interpretation before it is entitled to deference. *National Fuel Gas Supply* was not so limited. So long as FERC adequately explains why it interprets the contract as it does, we assume that its explanation is drawn from its statutory responsibility and experience.

The Commission, on remand, sent the case to an ALJ for an evidentiary hearing. After extensive testimony, the ALJ concluded that Cajun failed to meet its burden that the parties had intended Cajun's interpretation—and the Commission affirmed his findings. It is not necessary to review those findings in detail. Essentially, the ALJ determined that even if Cajun (supported by the Rural Electrification Administration)[2] had affirmatively wished to gain the right it now claims it obtained—in return for helping Gulf States to finance a nuclear power plant that would provide electricity to both Gulf States and Cajun—Gulf States never agreed to it. The ALJ concluded the negotiating parties used euphemisms to dance around this issue, which, if it had been forthrightly addressed, might have broken the deal.

■ As the ALJ (and the Commission) noted, the negotiations took place against a backdrop in which the disputed issue had been highlighted. Once, before the negotiations which led to the amendment, in July 1973, Cajun had requested a delivery point to serve a customer, Cortina Mall, which was four miles away from the integrated system of Cajun member Dixie. Gulf States had rejected that request, stating that "the point is not geographically located on the system of Dixie." Cajun was told that Gulf States would never give Cajun's members the right to tap into its transmission system at will. Cajun informed Gulf States that this was not its intent. 59 F.E.R.C. at 65,177. That position is certainly understandable. The ALJ and the Commission thus concluded that if Cajun had actually gained such a major concession in the subsequent negotiations, it would have been clearly spelled out.[3] Moreover, that Cajun did not even assert the alleged right until 1989, nine years after the amendment, supports that conclusion. We think the ALJ's finding, affirmed by the Commission, is supported by substantial evidence.

With this background, the Commission again examined the contract's wording. Cajun looks to Section 3.2(b) to support its interpretation of Section 3.3(d).[4] Section 3.2(b) limits Gulf States' obligations to transmit electricity [for normal load growth] to delivery points on "the integrated system." This explicit geographic limitation, however, is not contained in Section 3.3(d), therefore Cajun argues that no geographic limitation governs Section 3.3(d). The phrase "mutually agreeable points" in Section 3.3(d) gives Gulf States, according to Cajun, the right to object only based on engineering considerations.

The Commission reasonably concluded, however, that Section 5.1's limitations applied to Section 3.3(d). While it might be true that it is "incredible," as Cajun argues, that "so unclear and verbally attenuated a cross-reference was selected ... in order to establish so critical a limitation," it is at least equally "incredible" that such an important concession by Gulf States would not be clearly embodied in the contract. The language used in Section 3.2(b) is not decisive. Section 3.2(b) was written in 1976 while Section 3.3(d) was written in 1980. Therefore the Commission understandably was unwilling to accept the negative inference Cajun sees in Section 3.3(d)—elimination of Section 3.2(b)'s geographic limitation.

The Commission has adequately addressed our two specific concerns. We wondered why Gulf States might wish to explicitly reserve the right to contest an interconnection in a *regulatory proceeding* if Section 5.1's limitations were applicable. The Commission

2. The ALJ found that "[d]uring the Cajun–Gulf States negotiations leading to the 1980 amendment to the PIA, REA was a 'dominant force.'" *Cajun Elec. Power Coop., Inc. v. Gulf States Utilities Co.,* 59 F.E.R.C. ¶ 63,024 at 65,198 (1992).

3. Cajun was perhaps disadvantaged because its primary negotiators were deceased, so it relies heavily on attacking the credibility of Gulf States' negotiator—which of course is not the easiest way to put on an affirmative case.

4. Section 3.2(b), in relevant part, provides:

Gulf States shall have the option of providing any additional transmission capacity for *normal load growth* either to the Delivery Points specified in Exhibit "A" of Rate Schedule CSTS or providing it to additional Delivery Points *on the integrated systems* of the [Cajun] member rural electric cooperatives *at locations agreed to by the parties.*
(emphases added).

explained that this provision ensures that Gulf States' permission for an interconnection is not construed as a waiver of its right to contest the interconnection in a regulatory proceeding. Even if we were to adopt Cajun's interpretation of Section 3.3(d), this provision would still have the same purpose. Cajun has not persuaded us that the likelihood of Gulf States having legitimate grounds for contesting such an interconnection, when delivery points are confined to the integrated system, are so insignificant as to render FERC's interpretation unreasonable.

The Commission also determined that the addition of Section 3.3(d) had a specific purpose. It was to ensure that Cajun would be able to provide its members with electricity for above normal load growth. FERC reasonably concluded that "Gulf States [before the amendment] had *no obligation* to furnish facilities to assure adequate capacity for above-normal growth at all." *Cajun Elec.*

*Power Coop., Inc. v. Gulf States Utilities Co.,* 66 F.E.R.C. ¶ 61,325 at 62,056 (1994) (emphasis added). Such an interpretation does not imply that before the addition of Section 3.3(d) Gulf States could have refused to permit construction of the facilities necessary for Cajun to receive electricity from the points of interconnection listed in Exhibit A. Gulf States, under Section 2.1, had an obligation to construct such facilities so long as it was for normal load growth.

For the preceding reasons, the petition is denied.